# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | DIVISION ONE |
| Respondent, | ) ) | No. 66924-9-I |
| v. | ) ) | |
| MICHAEL EMERIC MOCKOVAK | ) | UNPUBLISHED OPINION |
| Appellant. | ) ) | FILED: May 20, 2013 |

DWYER, J. — Dr. Michael Mockovak, the former co-owner of Clearly Lasik, Inc., appeals from his convictions of attempted murder in the first degree, solicitation to commit murder in the first degree, attempted theft in the first degree, and conspiracy to commit theft in the first degree arising from Mockovak's attempt to hire Russian mobsters to murder his business partner, Dr. Joseph King. Over the course of several months, Mockovak plotted with Daniel Kultin, the information technologies director at Clearly Lasik, to arrange the murder of King and to thereafter collect on a $4 million insurance policy. Unbeknownst to Mockovak, however, Kultin was working as an informant for the FBI. Kultin wore a concealed recording device during several of his conversations with Mockovak in which the two men discussed the plan to murder King. After Mockovak delivered a $10,000 payment for the murder along with a photograph of King and his family, he was arrested.

Mockovak contends that the jury was improperly instructed regarding the defense of entrapment and that several of his convictions violate the double jeopardy provisions of our state and federal constitutions. Mockovak further contends that the charging document did not apprise him of the essential elements of the crime of conspiracy to commit theft in the first degree and that there was insufficient evidence adduced at trial for the jury to convict him of this crime. Finally, Mockovak asserts, Kultin's actions as an FBI informant during the investigation constituted outrageous government conduct in violation of due process. These claims are all without merit and, accordingly, we affirm.

I

Mockovak and King began practicing together in 2002. The two doctors were the co-owners of Clearly Lasik, a business providing refractive eye surgery. By 2009, the company had grown to operate several surgical centers in both the United States and Canada.

In early 2009, Kultin, the director of information technologies at Clearly Lasik, began to suspect that Mockovak was planning the murder of the company's former chief executive officer, Brad Klock. Klock, who had been fired from Clearly Lasik in 2006, had filed suit for wrongful termination, seeking damages in the amount of $750,000. On several occasions, Mockovak asked Kultin, a Russian immigrant, whether he had friends in Russia who could do something that would put an end to Klock's civil case. Kultin first interpreted

- 2 -

these comments as jokes.[1]

Then, in March or April of 2009, as the two men sat alone in the Clearly Lasik lunchroom, Mockovak told Kultin that Klock would be traveling to Europe. In a quiet voice, Mockovak suggested that this would be a good opportunity for something to "happen" to Klock. Based upon Mockovak's demeanor, Kultin began to realize that Mockovak was serious about having Klock killed. After discussing the situation with his father, Kultin contacted the FBI.

In June 2009, Kultin was contacted by Special Agent Lawrence Carr to discuss Mockovak's comments. Agent Carr, who did not initially believe that Mockovak was serious about killing Klock, instructed Kultin that he must not bring up the subject of murder with Mockovak. Instead, Agent Carr told Kultin to tell Mockovak that Kultin was planning to visit a friend whom he believed to be a member of the Russian mafia. Agent Carr hoped that this fictional story would spark a conversation that would enable the FBI to understand "what Dr. Mockovak was thinking." However, when Kultin told this story to Mockovak, it did not prompt Mockovak to further discuss his thoughts regarding Klock. Instead, Mockovak merely commented that Kultin's story was interesting and that he would like to someday meet this person.

Then, on August 3, 2009, Mockovak telephoned Kultin and said that he would like to discuss "that thing that we talked about before." Kultin understood this to mean that Mockovak wanted to further discuss his thoughts regarding

---

[1] Mockovak had on several occasions jokingly told Kultin that he believed Kultin was associated with Russian criminal activity.

Klock. Kultin promptly relayed this information to Agent Carr, who told Kultin that if Mockovak were to raise the subject of harming Klock, Kultin should tell Mockovak that he knew people and would "make some calls."

Kultin met with Mockovak on August 5, 2009 at the Clearly Lasik office. The two men talked in the parking lot. Mockovak expressed his frustration with Klock, and Kultin understood that it was Mockovak's desire that Klock be murdered. Mockovak then raised the subject of his growing frustration with his business partner, King. King was seeking additional compensation for surgeries that he had been performing at Clearly Lasik's surgery centers in Canada. Mockovak told Kultin that King was a "greedy snake" who wanted to split up the business. He said that there was a large insurance policy on King's life that would be paid to Mockovak if King were to die. Mockovak told Kultin that "maybe we can look after Joe later."[2] As he had been instructed by Agent Carr, Kultin told Mockovak that he would make some calls.

Kultin next met with Mockovak on August 11, 2009. Agent Carr arranged for Kultin to wear a recording device.[3] At the meeting, Kultin told Mockovak that he had been in contact with persons regarding the murder of Klock. He told Mockovak that "they can do it," to which Mockovak responded, "Oh, good, good, good." Kultin then described the persons who would do the killing and explained that such murders are usually disguised as street robberies. Kultin told Mockovak that the men would make sure that the victim was dead.

---

[2] Both Mockovak and Kultin often referred to King by his nickname, Joe.
[3] The recordings were admitted into evidence at trial. A transcript of the recordings also was admitted.

Mockovak then asked how much the killing would cost. Kultin replied that it was "twenty grand," with $10,000 to be paid in advance and $10,000 to be paid after completion of the murder. Mockovak inquired what Kultin would receive, and Kultin told him that he would receive a portion of the money from the killers. Mockovak told Kultin, "Okay, you need to."

Mockovak then told Kultin that he did not want the murder to be done immediately. Rather, Mockovak explained, he wanted to wait until after the depositions in Klock's lawsuit were completed. If it appeared that Klock would drop his suit, then the murder, which Mockovak described as a purely "financial thing," would be unnecessary. Mockovak told Kultin that he must make this clear to the persons with whom he was discussing the murder-for-hire.

The two men then briefly discussed the possibility of having King killed for the proceeds of the insurance policy. Mockovak told Kultin that the insurance money would be distributed only in the event that King's death occurred before the business was split up. Mockovak then reiterated that no further action should be taken until after the depositions in Klock's lawsuit were completed.[4]

In the months following this meeting, Mockovak's frustration with King grew. On September 30, 2009, King sent Mockovak a letter stating that if the business was not split up by October 31, King would cease to perform surgeries at Clearly Lasik's surgery center in Alberta, Canada. Mockovak considered this an ultimatum and was extremely upset. Shortly after King reiterated his demand

---

[4] On September 16, the FBI paid Kultin $1,200 for the first two meetings he had with Mockovak. Kultin was not promised any specific future payment.

in a second letter on October 13, Mockovak began to search for information regarding King's vacation travel plans to Sydney, Australia.

Kultin next met with Mockovak on October 20, 2009. Kultin again wore a wire. Mockovak first reported that the depositions in Klock's lawsuit had been "outstanding." Mockovak told Kultin that there was nothing urgent about Klock, whom he described as nothing more than a "fly on the wall," but that the situation with King was different. Mockovak speculated that King was attempting to force him out of the business completely.

Mockovak told Kultin that King would be travelling to Australia in November and showed Kultin the flight information he had discovered during his investigation the previous week. Kultin told Mockovak that the cost of a murder might be less expensive in Australia, which Kultin described as "a wild place." Mockovak replied, "Oh that's good" and "That's what I'm thinking." Kultin said that he would ask his friend whether the murder could be accomplished in Australia. Mockovak told Kultin that he had secreted enough cash to pay for the hit.

On October 21, 2009, Mockovak called his insurance company and requested a copy of the policy on King's life. The policy, which insured King's life for $4 million, named Mockovak as the beneficiary.

Kultin and Mockovak met again on October 22, 2009. In this conversation, which was also recorded by the FBI, Kultin told Mockovak that he had spoken to his friend and that "Australia is actually very easy." He told Mockovak that King could be killed "as a robbery" or "as an accident." Mockovak

- 6 -

remarked that Australia was far away and that any investigation of King's death would never "come back here ever." Kultin asked whether King's wife, Holly, was also to be killed, and Mockovak told him "no." Mockovak told Kultin that he had been gathering cash and had by that time set aside $11,000. The two men then discussed when the post-murder payment would be required.

The tension between Mockovak and King intensified during the ensuing weeks. Both doctors threatened to fire a scheduler in the Renton office because she could not follow the conflicting directives that they imposed for scheduling surgeries. One employee at Clearly Lasik would later describe Mockovak as more angry than she had ever seen him.

Mockovak and Kultin next met to discuss the details of the plan on November 6, 2009. Mockovak described his attempts to discover additional details of King's travel plans. Mockovak told Kultin that he was trying to sell one of the Canadian surgical centers in anticipation of King's death. He said that he was excited about running the business without interference from King.

Kultin asked Mockovak how he would like the murder to be accomplished. Mockovak proposed that King could be killed while he ran on the beach. When Kultin inquired whether Mockovak would like King's body to be found, Mockovak replied that having the body discovered would be better for purposes of collecting the proceeds of the insurance policy. Mockovak told Kultin that he did not care whether the killers delivered any message to King before murdering him. Instead, Mockovak explained, "I just want him the fuck out of my way."

Kultin then asked Mockovak whether he had "thought this through," and

Mockovak replied that he was a "little uneasy." Kultin asked him whether he was going to "freak out" if the murder occurred, and Mockovak told him that he would not. Mockovak explained that although part of him was uneasy, he did not want to put himself at the mercy of an arbitrator or a judge. He told Kultin that King really "ha[d] this coming." Killing King, Mockovak explained to Kultin, was "the only sure way."

Mockovak and Kultin then discussed how to launder the post-murder payment. Mockovak was concerned that his bank account activity would look suspicious if he were to withdraw a large sum of money shortly before King's death. The two men determined that Mockovak would purchase an expensive (but fake) watch from a jeweler associated with the same criminal organization for which the hit-men were working. Kultin emphasized that the second payment must be made or that both Mockovak and he would be in danger. Mockovak told Kultin that he understood and that he had no desire to get "serious people like this upset."

The two men then discussed what Kultin would receive for his part in the plot. Mockovak told Kultin that he would be hired as the director of marketing at Clearly Lasik. They agreed that no change in Kultin's position within the company should occur until at least six months after the completion of the murder. Mockovak then told Kultin that most of the insurance money would be used to pay Clearly Lasik's obligations and to purchase King's half of the business from King's wife, who would be a co-owner after King's death. Mockovak explained that although this would be expensive, he hoped that "at the

end of it all there's like a hundred grand for you."

Near the end of the conversation Mockovak told Kultin that he had often considered going to the garage of Clearly Lasik and killing King himself. Kultin replied, "don't do that." He told Mockovak that it was a "good thing you came to me because otherwise you would have done it the wrong way."

Mockovak and Kultin agreed to meet the following day near Sea-Tac International Airport in order for Mockovak to deliver the first payment. The conversation concluded with Mockovak reiterating that the choice of Australia for the murder was "almost too good to be true."

On November 7, 2009, Mockovak and Kultin spoke by telephone. Mockovak told Kultin that he had successfully stolen a portrait of King and his family from the Clearly Lasik office in Vancouver, Washington. He told Kultin that he was pleased that they had met on the previous night because it had given him 24 hours to contemplate the murder plan. Mockovak said, "It's absolutely the right thing to do."

That night, Mockovak and Kultin met at a soccer park near the airport. The meeting was recorded by the FBI. The men went into a restroom where, as they had planned, Mockovak gave Kultin $10,000 in cash. Mockovak "wanted to make sure" that he would get his money back in the event that the hit was unsuccessful. Kultin replied that Mockovak would not lose his money.

Mockovak then gave Kultin the photograph of King and his family. He explained that King now had three children and that the children were slightly older than they appeared in the picture. Kultin assured Mockovak that the picture

of King's wife would be sufficient for the killers to identify King. Mockovak also gave Kultin a piece of paper on which he had handwritten King's flight information. He told Kultin, "we're ready."

On November 11, 2009, at the direction of the FBI, Kultin called Mockovak and told him that everything was in place for the murder. He explained that the killers had located King in Australia and that they were now watching him. Kultin told Mockovak that he was expecting to hear news of the murder within several days. Mockovak responded, "That sounds good."

Mockovak was arrested on November 12, 2009. He was charged with solicitation to commit murder in the first degree of Dr. Joseph King, attempted murder in the first degree of Dr. Joseph King, conspiracy to commit theft in the first degree, attempted theft in the first degree, and solicitation to commit murder in the first degree of Brad Klock. A jury found Mockovak guilty as charged of the first four charges but acquitted him of solicitation to murder Brad Klock.

At sentencing, the trial court determined that Counts 2 and 3 (solicitation to commit murder and attempted murder of Dr. King) constituted the same course of criminal conduct. The court further concluded that Counts 4 and 5 (conspiracy to commit theft and attempted theft) constituted the same course of criminal conduct. Mockovak was thereafter sentenced to a term of imprisonment within the standard range.

Mockovak appeals.

II

Mockovak first contends that he received ineffective assistance of counsel

when his attorney proposed a jury instruction regarding the defense of entrapment. Mockovak asserts that the instruction was not an accurate statement of the law, that it was deficient performance for his attorney to propose it, and that there was a reasonable probability that, but for defense counsel's error, the outcome of his trial would have been different.[5] We disagree.

In order to establish ineffective assistance of counsel, the defendant must establish both that his attorney's performance was deficient and that the deficiency prejudiced the defendant. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); State v. Hendrickson, 129 Wn.2d 61, 77-78, 917 P.2d 563 (1996). Deficient performance is performance falling "below an objective standard of reasonableness based on consideration of all the circumstances." State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). There is a strong presumption that defense counsel's performance was reasonable. State v. Studd, 137 Wn.2d 533, 551, 973 P.2d 1049 (1999). "[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Strickland, 466 U.S. at 689. Accordingly, "[j]udicial scrutiny of

---

[5] The doctrine of invited error precludes Mockovak from directly challenging the jury instruction that was given by the trial court. The invited error doctrine "prohibits a party from 'setting up error in the trial court and then complaining of it on appeal.'" State v. Armstrong, 69 Wn. App. 430, 434, 848 P.2d 1322 (1993) (quoting State v. Young, 63 Wn. App. 324, 330, 818 P.2d 1375 (1991)). Even where constitutional rights are involved, an appellate court is "precluded from reviewing jury instructions when the defendant has proposed an instruction or agreed to its wording." State v. Winings, 126 Wn. App. 75, 89, 107 P.3d 141 (2005). Here, it was Mockovak who proposed the entrapment instruction. The entrapment instruction given by the trial court was identical to the instruction proposed by Mockovak. In such circumstances, any challenge to the entrapment instruction must be reviewed pursuant to the ineffective assistance of counsel standard set forth in Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). See, e.g., State v. Kyllo, 166 Wn.2d 856, 862-63, 215 P.3d 177 (2009).

counsel's performance must be highly deferential."[6] Strickland, 466 U.S. at 689.

In this case, the entrapment instruction proposed by Mockovak's attorney and given by the trial court was identical to that set forth in Washington Pattern Jury Instruction (WPIC) 18.05.[7] The entrapment instruction stated:

> Entrapment is a defense to each of the charges in this case if the criminal design originated in the mind of law enforcement officials, or any person acting under their direction, and Michael Mockovak was lured or induced to commit a crime that he had not otherwise intended to commit.
> The defense is not established if the law enforcement officials did no more than afford Michael Mockovak an opportunity to commit a crime. The use of a reasonable amount of persuasion to overcome reluctance does not constitute entrapment.
> Michael Mockovak has the burden of proving this defense by a preponderance of the evidence. Preponderance of the evidence means that you must be persuaded, considering all the evidence in the case, that it is more probably true than not true. If you find that Michael Mockovak has established this defense, it will be your duty to return a verdict of not guilty.

Mockovak contends that the second sentence of the second paragraph of this instruction—stating that "[t]he use of a reasonable amount of persuasion to overcome reluctance does not constitute entrapment"—is not a component of an entrapment defense. Although an identical statement appears in WPIC 18.05, Mockovak nevertheless contends that it was deficient performance for his attorney to propose it.

Where there is no case law indicating that a pattern jury instruction

---

[6] The prejudice prong requires the defendant to prove that there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different. State v. Leavitt, 111 Wn.2d 66, 72, 758 P.2d 982 (1988). If either element of the test is not satisfied, the inquiry ends. Hendrickson, 129 Wn.2d at 78.

[7] 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 18.05 (3d ed. 2008).

misstates the law, it is not deficient performance for defense counsel to propose such an instruction. Studd, 137 Wn.2d at 551. Our Supreme Court has explained that in such circumstances, "counsel can hardly be faulted for requesting a jury instruction based upon a then-unquestioned [pattern jury instruction]." Studd, 137 Wn.2d at 551. On the other hand, where existing case law indicates that a pattern jury instruction is flawed, counsel's failure to "research or apply relevant law" may constitute deficient performance. State v. Kyllo, 166 Wn.2d 856, 868-69, 215 P.3d 177 (2009).

Here, Mockovak fails to identify any decision by a court in our state indicating that—at the time of his trial—WPIC 18.05 was an incorrect statement of the law of entrapment. We most recently addressed this instruction in State v. O'Neill, 91 Wn. App. 978, 967 P.2d 985 (1998). In that case, the government agent was a corrupt police officer who was illegally soliciting a bribe for his own personal benefit, not an undercover officer investigating a crime. O'Neill, 91 Wn. App. at 982-83. In such circumstances, we concluded, no amount of persuasion by the officer would be reasonable and, accordingly, a jury instruction indicating that "a reasonable amount of persuasion to overcome reluctance does not constitute entrapment" was improper. O'Neill, 91 Wn. App. at 982. We noted, however, that "[t]he 'reasonable amount of persuasion to overcome reluctance' language is clearly designed for the typical undercover or sting operation." O'Neill, 91 Wn. App. at 990. Accordingly, we explained, such an instruction is

- 13 -

"perfectly appropriate in the normal entrapment case."[8] O'Neill, 91 Wn. App. at 990.

This statement in O'Neill, of course, would hardly alert defense counsel that "the reasonable amount of persuasion" language of WPIC 18.05 was improper in the circumstances presented. Instead, our discussion in O'Neill would inform counsel that this language is properly utilized in cases involving a "typical undercover or sting operation." 91 Wn. App. at 990. The case against Mockovak was built through precisely such an operation and, accordingly, counsel cannot be faulted for proposing an instruction that, as we noted, is "perfectly appropriate" in such circumstances.

Nor does any decision of our Supreme Court alter this conclusion. In State v. Smith, a case upon which we relied in O'Neill, the court explained that the use of a "normal amount of persuasion" by police to overcome the reluctance of a suspect to enter into a criminal transaction does not constitute entrapment. 101 Wn.2d 36, 42-43, 677 P.2d 100 (1984) (citing State v. Waggoner, 80 Wn.2d 7, 11, 490 P.2d 1308 (1971)). In that case, because the undercover officer had done no more than appeal to the defendant's sympathy in attempting to induce a sale of illegal drugs, the court determined that an entrapment defense must fail as a matter of law. Smith, 101 Wn.2d at 42-43. Without evidence of "misconduct or unfair inducement," the defendant's allegations were insufficient to establish the elements of this defense. Smith, 101 Wn.2d at 43.

---

[8] The WPIC commentary, citing to O'Neill, indicates that the law of entrapment in bribery cases requires special analysis. WPIC 18.05.

Indeed, both the majority and the dissent in Smith were in agreement with regard to this underlying point of law. As Justice Utter explained:

> [T]he statute speaks only of an actor who is "lured or induced". RCW 9A.16.070. On its face, this suggests that any inducement, perhaps even a mere request, is sufficient to prove this element of entrapment. Indeed, there is weighty authority in other jurisdictions taking precisely this position. . . .
> Despite this authority, the courts in this state have taken what I believe to be the better approach and required that the inducement go beyond "a normal amount of persuasion" (State v. Waggoner, 80 Wn.2d 7, 11, 490 P.2d 1308 (1971)) and be such as can be said to constitute "undue solicitation" (State v. Swain, 10 Wn. App. 885, 889, 520 P.2d 950 (1974)).

Smith, 101 Wn.2d at 46-47 (Utter, J., dissenting). Although Justice Utter went on to explain that, in his view, the majority had erred by determining that only a reasonable amount of persuasion had been utilized by the undercover officers in that case, Smith, 101 Wn.2d at 48-49 (Utter, J., dissenting), nothing in the majority or dissenting opinions would alert future defense counsel that WPIC 18.05 contained an incorrect statement of the law. Indeed, regarding the requirement that there be something more than a normal amount of persuasion to prove entrapment, the court's opinion was unanimous.

Nevertheless, Mockovak contends that Division Three's 1981 decision in State v. Keller, 30 Wn. App. 644, 637 P.2d 985 (1981), "unequivocally held that the amount of persuasion used by government agents [is] irrelevant to the entrapment defense." Br. of Appellant at 76. He points to the following passage:

> [I]t is true as the State argues that use by police officials of a normal amount of persuasion to facilitate the commission of a crime does not constitute entrapment. State v. Waggoner, 80 Wn.2d 7, 10-11, 490 P.2d 1308 (1971). However, it is not necessary to prove outrageous conduct when asserting the statutory defense.

- 15 -

> That evidence is relevant only if it is contended the conduct violated due process.

Keller, 30 Wn. App. at 647.

This case is not helpful to Mockovak. First, the authority discussed above postdates Division Three's decision in Keller. It was three years after Keller that our Supreme Court reiterated that the use of a normal amount of persuasion by undercover officers does not amount to entrapment. Smith, 101 Wn.2d at 42-43. Counsel cannot, of course, be faulted for relying upon a subsequent decision of our Supreme Court—unanimous on this particular point of law—for a proposition that contradicts a prior decision of an appellate court.

Furthermore, the passage cannot be reasonably interpreted to indicate, as Mockovak would have it, that the amount of persuasion is irrelevant to an entrapment defense. Instead, in making this statement, the court was merely explaining that a defendant need not produce evidence proving outrageous conduct in order for an entrapment defense to be successful. Evidence of such extreme conduct, as the court correctly noted, would simply not be "relevant" to an entrapment defense. Contrary to Mockovak's assertion, this case also would not tend to apprise defense counsel that the proposed entrapment instruction was somehow erroneous.[9]

Because there was no case law at the time of Mockovak's trial indicating

---

[9] Mockovak appears to additionally assert that the entrapment instruction is incorrect because a defendant's entrapment defense must be evaluated pursuant to a subjective standard and not an objective standard. This argument, however, was raised by Mockovak for the first time at oral argument. Issues so raised, even constitutional ones, "are not properly before this court." State v. Johnson, 119 Wn.2d 167, 170, 829 P.2d 1082 (1992). We decline to consider Mockovak's untimely argument.

that WPIC 18.05 contained an incorrect statement of the law, defense counsel did not provide ineffective assistance by proposing an instruction based upon this pattern jury instruction.[10] See Studd, 137 Wn.2d at 551. Defense counsel's performance did not fall "below an objective standard of reasonableness based on consideration of all the circumstances," McFarland, 127 Wn.2d at 334-35, and, accordingly, Mockovak's ineffective assistance of counsel claim fails.[11]

III

Mockovak next contends that his convictions of solicitation to commit murder in the first degree and attempted murder in the first degree constitute multiple punishments for the same offense in violation of the double jeopardy clauses of the state and federal constitutions. In addition, Mockovak contends that the trial court erred by declining to merge these crimes because, he asserts, solicitation to commit murder is a lesser included offense of attempted murder. We disagree on both counts.

---

[10] The absence of such case law distinguishes the circumstances of this case from the situation at issue in Kyllo, 166 Wn.2d 856. In that case, our Supreme Court determined that the existence of several relevant appellate decisions should have indicated to defense counsel that a pattern jury instruction pertaining to the law of self-defense was incorrect. Kyllo, 166 Wn.2d at 867.

[11] Mockovak additionally contends that he received ineffective assistance of counsel when his attorney did not object to the prosecutor's statement during closing argument that there were "essentially three elements" to Mockovak's entrapment defense. Br. of Appellant at 80. However, the trial court's instruction to the jury listed four things that Mockovak was required to prove in order to succeed on this defense: (1) that the crime originated with law enforcement, (2) that Mockovak was lured or induced to commit a crime he had not otherwise intended to commit, (3) that law enforcement officials did more than simply afford Mockovak an opportunity to commit a crime, and (4) that the persuasion used to overcome Mockovak's reluctance was more than a reasonable amount. Where a prosecutor's argument is based upon the instructions given by the trial court, there is no misconduct. State v. Anderson, 153 Wn. App. 417, 430, 220 P.3d 1273 (2009). Any objection by defense counsel to the prosecutor's statement during closing argument—which accurately reflected the court's instructions to the jury—would have been properly overruled. Thus, because Mockovak fails to demonstrate that his attorney's decision not to object had any effect on the outcome of his trial, this claim of ineffective assistance of counsel also fails. See Leavitt, 111 Wn.2d at 72.

The double jeopardy clauses of our state and federal constitutions protect a defendant against multiple punishments for the same offense.[12] WASH. CONST. art. I, § 9; U.S. CONST. amend. 5; State v. Calle, 125 Wn.2d 769, 772, 888 P.2d 155 (1995). Although the State may bring multiple charges arising from the same criminal conduct, "'[w]here a defendant's act supports charges under two criminal statutes, a court weighing a double jeopardy challenge must determine whether, in light of legislative intent, the charged crimes constitute the same offense.'" State v. Freeman, 153 Wn.2d 765, 771, 108 P.3d 753 (2005) (quoting In re Pers. Restraint of Orange, 152 Wn.2d 795, 815, 100 P.3d 291 (2004)). "If the legislature authorized cumulative punishments for both crimes, then double jeopardy is not offended." Freeman,153 Wn.2d at 771.

"If the language of the criminal statutes under which the defendant has been punished does not expressly disclose legislative intent with respect to multiple punishments, the court then considers principles of statutory construction to determine whether multiple punishments are authorized." In re Pers. Restraint of Borrero, 161 Wn.2d 532, 536, 167 P.3d 1106 (2007). In such circumstances, "the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." Blockburger v. United States, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932). "'If there is an element in each offense which is not

---

[12] The Washington double jeopardy provision, WASH. CONST. art. I, § 9, is coextensive with the Fifth Amendment as interpreted by the United States Supreme Court. State v. Gocken, 127 Wn.2d 95, 107, 896 P.2d 1267 (1995). Claims of double jeopardy are reviewed de novo. State v. Freeman, 153 Wn.2d 765, 770, 108 P.3d 753 (2005).

included in the other, and proof of one offense would not necessarily also prove the other, the offenses are not constitutionally the same and the double jeopardy clause does not prevent convictions for both offenses.'" Calle, 125 Wn.2d at 777 (quoting State v. Vladovic, 99 Wn.2d 413, 423, 662 P.2d 853 (1983)). Thus, where the factual grounds for two crimes are distinct, no double jeopardy issue arises. State v. Schneider, 36 Wn. App. 237, 243 n.3, 673 P.2d 200 (1983).

"Where one of the two crimes is an attempt crime, the test requires further refinement." Borrero, 161 Wn.2d at 537. This is because, our Supreme Court has explained, one of the elements of an attempt crime is that the defendant "'does any act which is a substantial step toward the commission of that crime.'" Borrero, 161 Wn.2d at 537 (quoting former RCW 9A.28.020(1) (1975)). The "substantial step" element is merely a placeholder until the facts of the particular case give it independent meaning. Borrero, 161 Wn.2d at 537. "Only by examining the actual facts constituting the 'substantial step' can the determination be made that the defendant's double jeopardy rights have been violated." Borrero, 161 Wn.2d at 537.

However, the court explained, even where the same facts supporting the defendant's conviction for the separate offense *could* also constitute the substantial step of the attempt, double jeopardy is not violated where there are additional facts in the record that would also constitute the substantial step. Borrero, 161 Wn.2d at 538. The reviewing court should not presume "that the trier of fact relied on only the facts tending to prove both crimes." Borrero, 161 Wn.2d at 538. Instead, unless the facts providing the basis for the separate

- 19 -

conviction are also *necessary* to prove the attempt crime, double jeopardy principles are not offended. Borrero, 161 Wn.2d at 538-39.

Here, in order to convict Mockovak of the crime of attempted murder in the first degree, the State was required to demonstrate that Mockovak engaged in an act "which is a substantial step toward the commission of that crime."[13] RCW 9A.28.020(1). "[C]onduct is not a substantial step 'unless it is strongly corroborative of the actor's criminal purpose.'" State v. Workman, 90 Wn.2d 443, 451, 584 P.2d 382 (1978) (quoting Model Penal Code § 5.01(2)).

By contrast, to prove the crime of solicitation to commit murder in the first degree, the State was required to demonstrate that Mockovak offered to give money or some other thing of value to another to engage in conduct constituting first degree murder.[14] State v. Jensen, 164 Wn.2d 943, 949, 195 P.3d 512 (2008). Solicitation alone, which "involves no more than asking or enticing someone to commit a crime," does not constitute the crime of attempt. State v. Gay, 4 Wn. App. 834, 839-40, 486 P.2d 341 (1971). In this case, however, Mockovak contends that the same evidence used to prove the crime of solicitation—a payment of money to commit the murder—was also used to prove

---

[13] The criminal attempt statute provides:
A person is guilty of an attempt to commit a crime if, with intent to commit a specific crime, he or she does any act which is a substantial step toward the commission of that crime.
RCW 9A.28.020(1).

[14] The criminal solicitation statute provides:
A person is guilty of criminal solicitation when, with intent to promote or facilitate the commission of a crime, he or she offers to give or gives money or other thing of value to another to engage in specific conduct which would constitute such crime or which would establish complicity of such other person in its commission or attempted commission had such crime been attempted or committed.
RCW 9A.28.030(1).

- 20 -

the substantial step of the attempted murder.

Mockovak does not demonstrate that this was so. As noted above, a double jeopardy issue arises only if the same evidence used to prove the crime of solicitation was necessary to prove the substantial step of the attempted murder. See Borrero, 161 Wn.2d at 538-39. Here, the jury was instructed that the conduct supporting the crime of solicitation and the conduct supporting the crime of attempted murder occurred on different dates. The "to-convict" instruction on solicitation stated that in order to convict Mockovak of this crime, the jury must find that Mockovak had offered to give money or other things of value to Kultin between October 14, 2009 and November 6, 2009. The "to-convict" instruction for the attempted murder charge, on the other hand, stated that the jury must find that Mockovak had attempted to cause the death of King on a single day: November 7, 2009. There was no overlap between the two time periods and, accordingly, the jury could not have relied upon the same acts by Mockovak to find him guilty of both solicitation and attempted murder. "A jury is presumed to follow the court's instructions." State v. Foster, 135 Wn.2d 441, 472, 957 P.2d 712 (1998). Because the two convictions were based on distinct factual grounds, no issue of double jeopardy arises. Schneider, 36 Wn. App. at 243 n.3.

Moreover, with regard to the crime of attempted murder, the jury heard evidence that Mockovak gave to Kultin not only a payment of money, but also a copy of King's travel itinerary and a picture of King's family in order to facilitate the murder. These items were, of course, not "money or other things of value"

utilized by Mockovak to entice Kultin to commit the murder and, accordingly, the evidence of these deliveries was not relevant to proving the crime of solicitation. This evidence was, however, highly relevant to proving the crime of attempted murder. See Gay, 4 Wn. App. at 841-42 (attempted murder proved by evidence that defendant delivered not only payment, but also pictures of intended victim and description of his habits and location). Because such actions were "strongly corroborative of [Mockovak's] criminal purpose," Workman, 90 Wn.2d at 451 (quoting Model Penal Code § 5.01(2)), the jury would be entitled to determine that it was this aspect of Mockovak's conduct that constituted the substantial step of the attempted murder. Thus, because the evidence of Mockovak's delivery of payment was not the only evidence of the attempted murder, for this reason as well, no double jeopardy issue arises. Borrero, 161 Wn.2d at 539.

Nevertheless, Mockovak contends that his double jeopardy rights were violated because our Supreme Court has determined that solicitation is an "inherently continuous offense." Jensen, 164 Wn.2d at 957. Mockovak is correct that the unit of prosecution for solicitation centers on the enticement to commit the unlawful act and that, no matter how many times such a request is repeated, only one charge of solicitation is permitted. Jensen, 164 Wn.2d at 956-57. Accordingly, it is likely true that Mockovak's delivery to Kultin of the $10,000 payment would not support a second prosecution for solicitation. However, Mockovak fails to show how this is relevant in the circumstances of this case. Only a single charge of solicitation was brought against Mockovak. Mockovak cites to no authority indicating that where a particular act could serve as evidence

- 22 -

of an "inherently continuous offense," this act may not be utilized to support a different crime. Rather, in such circumstances, the proper test "to determine whether there are two offenses or only one" is the same evidence test set forth in Blockburger, 284 U.S. at 304. See State v. Adel, 136 Wn.2d 629, 633, 965 P.2d 1072 (1998). As discussed above, application of the test to the facts of this case reveals no violation of double jeopardy. Mockovak's observations regarding the unit of prosecution for solicitation are not helpful to his claim.

Finally, Mockovak contends that his convictions violate the merger doctrine because, he asserts, the crime of solicitation to commit murder is a lesser included offense of attempted murder. In instances where the degree of one offense is elevated by conduct constituting a separate offense, "the merger doctrine may help determine legislative intent."[15] State v. Kier, 164 Wn.2d 798, 804, 194 P.3d 212 (2008) (citing Vladovic, 99 Wn.2d at 419). Application of this doctrine is appropriate, however, "only when a crime is elevated to a higher degree by proof of another crime proscribed elsewhere in the criminal code." State v. Parmelee, 108 Wn. App. 702, 710, 32 P.3d 1029 (2001).

Here, the crime of attempted murder is not elevated to a higher degree by proof that Mockovak committed solicitation to commit murder and, accordingly, the merger doctrine does not apply.[16] Moreover, the merger doctrine has no

---

[15] Under the merger doctrine, "when the degree of one offense is raised by conduct separately criminalized by the legislature," a presumption arises that "the legislature intended to punish both offenses through a greater sentence for the greater crime." Freeman, 153 Wn.2d at 772-73 (citing Vladovic, 99 Wn.2d at 419).

[16] Mockovak is also incorrect that solicitation to commit murder in the first degree is a lesser included offense of attempted murder in the first degree. Our Supreme Court has explained that "[a] lesser included offense exists when all of the elements of the lesser offense

- 23 -

applicability in circumstances where a defendant's multiple convictions are based upon separate and distinct criminal acts. See State v. Eaton, 82 Wn. App. 723, 731-32, 919 P.2d 116 (1996), overruled on other grounds by State v. Frohs, 83 Wn. App. 803, 811 n.2, 924 P.2d 384 (1996). Here, as discussed above, because different factual bases for the two crimes exist, the merger doctrine is inapplicable.

Mockovak's convictions of solicitation to commit murder in the first degree and attempted murder in the first degree do not violate the double jeopardy clauses of the state and federal constitutions. Nor did the trial court err by declining to apply the doctrine of merger to the challenged convictions.

IV

Mockovak asserts a similar set of arguments with regard to his convictions of conspiracy to commit theft in the first degree and attempted theft in the first degree. He contends that the same evidence used to prove the attempted theft was also utilized to prove that Mockovak took a substantial step in pursuance of the criminal agreement to commit theft—an element of the crime of conspiracy.[17]

---

are *necessary* elements of the greater offense." State v. Roybal, 82 Wn.2d 577, 583, 512 P.2d 718 (1973) (emphasis added). "'[I]f it is possible to commit the greater offense without having committed the lesser offense, the latter is not an included crime.'" State v. Turner, 143 Wn.2d 715, 729, 23 P.3d 499 (2001) (quoting Roybal, 82 Wn.2d at 583). It is, of course, clearly possible to commit the crime of attempted murder without committing criminal solicitation. A substantial step toward murder need not involve circumstances in which the defendant "offers to give or gives money or other thing of value to another." RCW 9A.28.030. Indeed, we have long so held. In Schneider, 36 Wn. App. at 243, we expressly stated that "solicitation is not a lesser included offense of the crime of attempted murder." Mockovak's contention to the contrary is without merit.

[17] Both the crime of conspiracy and the crime of attempted theft include a "substantial step" element. Mockovak does not contend, nor could he, that the same evidence necessary to prove the crime of conspiracy was also required to prove the substantial step of the attempted theft. Conspiracy includes the additional element of an "agreement," the proof of which is clearly

However, here as well, the State alleged that the acts underlying each of these offenses took place on different dates. The jury was instructed that in order to convict Mockovak of attempted theft, it must find that he took a substantial step toward the commission of this crime on November 7, 2009. By contrast, the "to-convict" instruction on conspiracy required the jury to assess Mockovak's actions between August 5, 2009 and November 6, 2009. Because the two convictions were based on distinct factual grounds, no issue of double jeopardy arises.[18] Schneider, 36 Wn. App. at 243 n.3.

V

Mockovak next contends—for the first time on appeal—that the information charging conspiracy to commit theft in the first degree improperly omits an essential element of the crime and that, accordingly, reversal of this conviction is required. We disagree.

An accused person has a constitutional right to be informed of the charge he is to meet at trial. State v. Pelkey, 109 Wn.2d 484, 487, 745 P.2d 854 (1987). Accordingly, the charging document must include all essential elements of a

---

unnecessary to prove an attempted theft. Accordingly, Mockovak's contention is that the same evidence used to prove the attempted theft was necessary to prove the substantial step element of the conspiracy.

[18] Mockovak asserts that the crime of attempted theft in the first degree is a lesser included offense of the crime of conspiracy to commit theft in the first degree. It is, however, clearly possible to commit conspiracy to commit theft without committing attempted theft. As our Supreme Court has explained, the "substantial step" definition for purposes of conspiracy is broader than the definition applicable to an attempt. State v. Dent, 123 Wn.2d 467, 477, 869 P.2d 392 (1994). Although mere preparation to carry out the criminal agreement is sufficient to demonstrate the substantial step of a conspiracy, something more is required to demonstrate the substantial step of attempt. Dent, 123 Wn.2d at 477. Thus, attempted theft in the first degree is not a lesser included offense of conspiracy to commit theft in the first degree. See Turner, 143 Wn.2d at 729.

crime in order to apprise the accused of the charges and facilitate the preparation of a defense. State v. Pineda-Pineda, 154 Wn. App. 653, 670, 226 P.3d 164 (2010). When the sufficiency of a charging document is first raised on appeal, however, it must be liberally construed in favor of validity. State v. Kjorsvik, 117 Wn.2d 93,104-05, 812 P.2d 86 (1991). In such circumstances, the information is constitutionally sufficient where: (1) "the necessary facts appear in any form, or by fair construction can . . . be found" on the face of the charging document, and (2) the defendant cannot "show that he or she was nonetheless actually prejudiced by the inartful language which caused a lack of notice." Kjorsvik, 117 Wn.2d at 105-06. Such a construction is required, our Supreme Court has explained, to discourage "sandbagging"—a "potential defense practice wherein the defendant recognizes a defect in the charging document but foregoes raising it before trial when a successful objection would usually result only in an amendment of the pleading." Kjorsvik, 117 Wn.2d at 103.

It is an essential element of the crime of conspiracy that a party to the criminal agreement "takes a substantial step in pursuance of such agreement." RCW 9A.28.040(1). In this case, the information charging conspiracy alleged that Mockovak "perform[ed] an overt act pursuant to the agreement." Mockovak contends that the phrase "overt act pursuant to the agreement" does not convey the same meaning as the statutory phrase "substantial step in pursuance of [the] agreement" and that, accordingly, he was hindered in his ability to prepare a defense to the charge of conspiracy to commit theft in the first degree.

However, pursuant to the liberal standard of construction set forth in

- 26 -

Kjorsvik, a charging document is sufficient so long as there is "some language in the document giving at least some indication of the missing element." Pineda-Pineda, 154 Wn. App. at 670. Mockovak is correct that an allegation of "conspiracy"—standing alone—does not adequately convey the element of a substantial step. State v. Moavenzadeh, 135 Wn.2d 359, 364, 956 P.2d 1097 (1998). In this case, however, there is additional language in the charging document that gave an "indication" of this element. Pineda-Pineda, 154 Wn. App. at 670. Although the phase "overt act pursuant to the agreement" is not identical in its meaning to the phrase "substantial step in pursuance of [the] agreement," under the more liberal Kjorsvik standard, such precision is not required. The two phrases fairly convey the same meaning, and the essential element of a substantial step is sufficiently conveyed. Accordingly, the charging document is constitutionally adequate.[19]

Mockovak nevertheless asserts that the information was defective because it failed to apprise him of the conduct which was alleged to have constituted the crime. However, a charging document need not state the "when, where or how" of the charged crime. State v. Noltie, 116 Wn.2d 831, 843-44,

---

[19] Mockovak asserts that the charging document's use of the term "overt act" improperly implies that a defendant may be convicted of conspiracy based upon evidence of "mere preparation." Br. of Appellant at 111. Such a state of affairs, he contends, is proscribed by this court's decision in State v. Gatalski, wherein the court explained that a substantial step must be an act "'which strongly indicates a criminal purpose and which is more than mere preparation.'" 40 Wn. App. 601, 613, 699 P.2d 804 (1985) (quoting former WPIC 100.05), implied overruling on other grounds recognized by State v. Baldwin, 63 Wn. App. 536, 540-41, 821 P.2d 496 (1991). That decision, however, related to the substantial step of a criminal attempt, not the substantial step pursuant to an agreement necessary to prove criminal conspiracy. Gatalski, 40 Wn. App. at 613. Our Supreme Court has explained that the "substantial step" definition for purposes of conspiracy is broader than the definition applicable to an attempt. Dent, 123 Wn.2d at 477. Contrary to Mockovak's assertion, in the context of conspiracy, mere preparation to carry out the agreement may constitute a substantial step. Dent, 123 Wn.2d at 477.

809 P.2d 190 (1991). As our Supreme Court has noted, "Washington courts have repeatedly distinguished informations which are constitutionally deficient and those which are merely vague." Noltie, 116 Wn.2d at 843. Where the information is overly vague, it is the defendant's burden to request a bill of particulars to correct the defect. Noltie, 116 Wn.2d at 843. Mere vagueness does not warrant reversal on appeal. Noltie, 116 Wn.2d at 844.

Here, as judged pursuant to the liberal Kjorsvik standard, the charging document adequately conveyed the essential elements of the crime of conspiracy to commit theft in the first degree. Because the information is constitutionally sufficient, Mockovak's claim fails.[20]

## VI

Mockovak next asserts that the current conspiracy statute violates due process and constitutes cruel and unusual punishment. He asserts that a 1997 amendment to the statute—which provides that it is no defense to conspiracy that the defendant's co-conspirator was "a law enforcement officer . . . who did not intend that a crime be committed," RCW 9A.28.040(2)(f)—is unconstitutional because it permits a conviction in the absence of a bilateral agreement to commit the crime. We disagree.

"A legislative act is presumptively constitutional, 'and the party challenging

_____

[20] In his opening brief, Mockovak additionally contends that the information charging conspiracy is defective because it did not identify his co-conspirator. However, the cases upon which Mockovak relies do not stand for such a proposition. Instead, these cases hold that where a co-conspirator *is* named in the information, the defendant may be convicted only upon proof of conspiring with the named persons. See, e.g., State v. Stark, 158 Wn. App. 952, 244 P.3d 433 (2010). Washington law does not require that the defendant's co-conspirator be identified in the charging document and, in his reply brief, Mockovak properly withdraws this claim.

it bears the burden of proving it unconstitutional beyond a reasonable doubt.'" State v. Heckel, 143 Wn.2d 824, 832, 24 P.3d 404 (2001) (quoting State v. Brayman, 110 Wn.2d 183, 193, 751 P.2d 294 (1988)). Here, in asserting that the conspiracy statute is unconstitutional, Mockovak relies exclusively upon our Supreme Court's decision in State v. Pacheco, 125 Wn.2d 150, 882 P.2d 183 (1994). The Pacheco decision, however, does not address either of the constitutional provisions raised by Mockovak in this appeal.

In Pacheco, the court's analysis was limited to construing the intent of the legislature in drafting a previous version of the conspiracy statute, former RCW 9A.28.040 (1975). 125 Wn.2d at 154. The term "agreement" was not defined by the statute. Pacheco, 125 Wn.2d at 154. Applying principles of statutory construction, the court concluded that the legislature had intended to adhere to the common law definition of "agreement," which required a "genuine or bilateral agreement" between actual criminal participants. Pacheco, 125 Wn.2d at 155. The court noted that although the Model Penal Code utilized a unilateral approach—permitting a conviction so long as the "the defendant believes another is agreeing to commit the criminal act," Pacheco, 125 Wn.2d at 154—the court would not presume that our legislature intended to depart from the requirements of the common law "unless that intention is made very clear." Pacheco, 125 Wn.2d at 156.

Mockovak's reliance on the court's reasoning in Pacheco, however, is plainly unwarranted. First, the legislature has subsequently clarified its intention to depart from the requirements of the common law. The 1997 amendments to

the conspiracy statute were adopted by the legislature following the court's decision in Pacheco. Laws of 1997, ch. 17, §1. The legislature determined that the unilateral approach to conspiracy should apply where the co-conspirator is "a law enforcement officer . . . who did not intend that a crime be committed." RCW 9A.28.040(2)(f). In such circumstances, no genuine or bilateral agreement is required; rather, it is enough that the defendant believed that the undercover agent was agreeing to commit the criminal act.

Second, and more importantly, the court in Pacheco engaged in no constitutional analysis. Instead, its reasoning was based solely upon principles of statutory interpretation. The court did not intimate that the adoption of the unilateral approach to conspiracy would exceed the legislative power to define criminal conduct. Indeed, the court noted with approval that the legislature had explicitly adopted the unilateral approach to conspiracy in circumstances where "the person with whom the accused is alleged to have conspired has been acquitted." Pacheco, 125 Wn.2d at 156 (citing State v. Valladares, 99 Wn.2d 663, 670, 664 P.2d 508 (1983)).

Mockovak cites to no case indicating that the unilateral approach to conspiracy is unconstitutional. Indeed, he falls far short of establishing that the Washington conspiracy statute is "'unconstitutional beyond a reasonable doubt.'" Heckel, 143 Wn.2d at 832 (quoting Brayman, 110 Wn.2d at 193). Accordingly, this claim fails.

VII

Mockovak next asserts that the evidence adduced at his trial was insufficient to support his conviction of conspiracy to commit theft in the first degree. Because, he contends, the State failed to prove the existence of an agreement between Mockovak and Kultin to commit first degree theft, he asserts that this conviction must be vacated. We disagree.

The State must prove each essential element of a charged crime beyond a reasonable doubt. State v. Oster, 147 Wn.2d 141, 146, 52 P.3d 26 (2002). In deciding whether sufficient evidence supports a conviction, we must view the evidence in the light most favorable to the State in order to determine whether any rational finder of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). A challenge to the sufficiency of the evidence admits the truth of the State's evidence. Salinas, 119 Wn.2d at 201. Moreover, "all reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." Salinas, 119 Wn.2d at 201. We must defer to the finder of fact on "issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." State v. Ainslie, 103 Wn. App. 1, 6, 11 P.3d 318 (2000).

In order to prove conspiracy to commit theft in the first degree, the State was required to prove: (1) that Mockovak agreed with one or more persons to engage in or cause the performance of conduct constituting the crime of theft in the first degree; and (2) that Mockovak made the agreement with the intent that

- 31 -

such conduct be performed.[21] RCW 9A.28.040. It is not necessary to show a formal agreement in order to prove a conspiracy to commit a crime. State v. Barnes, 85 Wn. App. 638, 664, 932 P.2d 669 (1997). Instead, the agreement may be proved by evidence of a "'concert of action, all the parties working together understandingly, with a single design for the accomplishment of a common purpose.'" Barnes, 85 Wn. App. at 664 (quoting State v. Casarez-Gastelum, 48 Wn. App. 112, 116, 738 P.2d 303 (1987)).

Here, Mockovak contends that the evidence does not establish that he entered into an agreement with Kultin to commit theft in the first degree. Rather, he asserts, the scope of Kultin's agreement with Mockovak was limited to causing the death of King. However, the record is replete with evidence demonstrating that the plan to kill King was—from its inception—inextricably linked to the plan to collect the insurance proceeds that would flow to Mockovak following King's death. From the outset of their discussions, Kultin and Mockovak contemplated that Mockovak would collect the proceeds of the insurance policy on King's life. This aspect of the plan was clearly conveyed to Kultin on multiple occasions; indeed, Kultin agreed to arrange to have King's body found in order to avoid potential difficulties in collecting the insurance proceeds. Moreover, pursuant to this plan, it was understood by Mockovak that Kultin would personally benefit from the collection of the insurance proceeds.

---

[21] In addition, the State was required to prove that a person "involved in the agreement took a substantial step in pursuance of the agreement" and that "the acts occurred in the State of Washington." Mockovak does not challenge the sufficiency of the evidence with regard to these elements.

Not only was Kultin promised a more lucrative position at Clearly Lasik once the insurance proceeds were used to repay the company's obligations, but Mockovak told Kultin that he hoped $100,000 of these monies could be set aside for Kultin as consideration for his role in arranging the murder.

Given this evidence, a rational jury could properly conclude that Mockovak agreed with Kultin to engage in or cause the performance of conduct constituting the crime of theft in the first degree. See RCW 9A.28.040. The State was not required to prove that Kultin agreed to personally take part in filing the fraudulent insurance claim in order to establish an agreement to accomplish the theft. The theft was to be accomplished by murdering King and then applying to the insurance company for payment of the death benefit. Kultin was aware of this purpose for the murder and agreed to take specific steps to facilitate this goal. Mockovak does not assert, nor could he, that the evidence fails to demonstrate that Mockovak intended that such conduct be performed. Nor does he contend that the evidence does not satisfy any other element of this crime.

The evidence is sufficient to support Mockovak's conviction of conspiracy to commit theft in the first degree, and Mockovak's contention to the contrary provides no basis for reversal.

## VIII

Mockovak's final contention is that Kultin's actions as a government informant constitute outrageous conduct in violation of due process. He asserts that the trial court erred by denying his motion to dismiss the charges against him on this basis. We disagree.

- 33 -

In order to obtain dismissal of a criminal prosecution based upon outrageous governmental conduct, the police conduct must "shock the universal sense of fairness." State v. Lively, 130 Wn.2d 1, 19, 921 P.2d 1035 (1996). Where such conduct is proved to have occurred, "'due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.'" Lively, 130 Wn.2d at 19 (quoting United States v. Russell, 411 U.S. 423, 431-32, 93 S. Ct. 1637, 36 L. Ed. 2d 366 (1973)). However, here, "the trial court was not asked to make findings of fact on this issue. . . . [I]n the absence of findings of fact or undisputed facts showing outrageous conduct by the [government]," dismissal on this basis is unwarranted. State v. Valentine, 132 Wn.2d 1, 24, 935 P.2d 1294 (1997).

In response to a query by the trial judge, Mockovak's attorney indicated that the entry of findings of fact was unnecessary. The prosecutor agreed.[22] Accordingly, the trial court denied Mockovak's motion to dismiss without entering findings of fact or conclusions of law.[23]

Nor are there undisputed facts from which we can determine that the government acted in such a manner that due process considerations dictate dismissal of the charges against Mockovak. Although Mockovak now asserts that the facts are undisputed, in order to so conclude, we would be forced to disregard much of the testimony of the prosecution's witnesses. Indeed,

---

[22] The prosecutor was prepared to hand up proposed findings of fact and conclusions of law, had the trial court expressed a desire to enter such findings.

[23] To the extent that the trial court erred by declining to enter such findings, the error was invited by Mockovak and cannot provide a basis for reversal. See Armstrong, 69 Wn. App. at 434.

Mockovak's own counsel expressly noted in the trial court that the relevant facts were in dispute. In response to the State's offer to submit proposed findings of fact on this issue, defense counsel noted that Mockovak would object to the State's proposed findings of fact, which, he asserted, were not "supported by the record." This indicates a clear disagreement between the parties as to the facts and the inferences to be drawn therefrom. Thus, there are not undisputed facts in the record demonstrating outrageous conduct.

The affirmative decision by defense counsel to forego the entry of findings of fact by the trial court, while surely tactical, is fatal to Mockovak's claim of outrageous conduct on appeal. In the absence of findings of fact or undisputed facts establishing outrageous conduct by Kultin, relief cannot be granted on this claim. Valentine,132 Wn.2d at 24.

Affirmed.

We concur: