[No. 48540–2.   En Banc.   June 2, 1983.]

THE STATE OF WASHINGTON, *Respondent*, v. RUDOLPHO
VALLADARES, *Petitioner*.

*Jeffrey Steinborn, Timothy K. Ford,* and *Gaither M. Kodis,* for petitioner.

*Patrick D. Sutherland, Prosecuting Attorney,* and *Gary R. Tabor, Deputy,* for respondent.

STAFFORD, J.—Petitioner Rudolpho Valladares was convicted by a jury on charges of possession, delivery, and conspiracy to deliver cocaine, a controlled substance. The Court of Appeals affirmed the convictions. *State v. Valladares,* 31 Wn. App. 63, 639 P.2d 813 (1982). We affirm the Court of Appeals with respect to the convictions for possession and delivery but reverse the Court of Appeals on the conspiracy charge.

Late in December 1978, Barbara Campbell called the Longview Police Department and asked to talk to an officer. On December 29, Detective Fisher contacted Campbell in the hospital where she was recovering from a suicide attempt. Campbell began the conversation by informing Fisher she had been involved in cocaine trafficking in the Kelso–Longview area. She told him that for "about the last two months, and two months prior to that time" her source had been petitioner, Rudolpho "Rudy" Valladares, a major drug dealer. Campbell expressed concern that she was unable to make a required $1,000 payment for cocaine she had received on consignment from Valladares. Fisher, who was not acquainted with either Campbell or Valladares, requested assistance from Chief Inspector Sexton of the

Washington State Patrol Drug Control Assistance Unit.

After interviewing Campbell, Agent Sexton offered to pay her debt to Valladares in exchange for an introduction. Sexton was to assume the identity of a pimp from Vancouver.

The meeting took place in a Longview bar on January 8, 1979. Valladares, Campbell, Sexton and a female undercover agent were present. Sexton began the conversation by offering to supply prostitutes for a Seattle "key club" with which Valladares was allegedly connected. Thereafter, according to witnesses present at the meeting, Valladares said "Say, Barbara mentioned that you may also be interested in some of my cocaine". Agent Sexton expressed an interest "if it's good quality and the price is right". Valladares assured him there was a high demand for his cocaine because of its extremely high quality. In fact, he claimed to be "dealing approximately 6 pounds of cocaine a week". According to the witnesses, Valladares bragged he had the cocaine market cornered in the Kelso–Longview area. Valladares was unable to state an exact price because he was leaving for Colombia the next day to negotiate the price for another shipment. Ultimately Sexton made preliminary arrangements for a purchase.

A few minutes later Valladares and Sexton met outside in Sexton's car. Valladares explained he did not want Barbara Campbell involved in their deal because of previous trouble collecting his money from her. When he mentioned Campbell owed him $1,000, Sexton offered him the money. Valladares accepted the funds, indicating that Sexton could work out that debt with Campbell any way he chose.

As negotiations continued over the next 3 months, Sexton told Valladares that he, Sexton, owed $240,000 to "the Las Vegas organized crime family", but that he might be able to persuade them to allow the next $80,000 installment to be invested in cocaine. Ostensibly to convince his "creditors" of the quality of the merchandise, Sexton purchased 1 ounce of cocaine for $1,900. He later purchased 2 ounces for "his girls".

Thereafter Neil Greppin, a federal drug enforcement agent, was brought in to pose as a Las Vegas "moneyman". Greppin told Valladares that Sexton would be allowed to invest in a cocaine deal only if Valladares could produce some kind of collateral to secure the transaction until a shipment could be delivered. A few days later Valladares introduced Sexton to Charles Minium, who agreed to supply a timber deed as security. Thereafter, Valladares agreed to sell Agent Greppin 2 pounds of cocaine for $50,000. It is of passing interest that Valladares suggested Sexton and he "cut" some of the cocaine with an adulterant, sell the extra, and split the profit.

On March 19, 1979, the parties met at a Thurston County truck stop to consummate the transaction. They sat in the agents' car, Valladares holding his briefcase. After a brief conversation, Minium assigned the timber deed to the agents and Valladares accepted from them a second briefcase containing $50,000. At that juncture, Valladares and Minium were arrested and taken to the police station.

Upon reaching the police station, the agents searched the briefcase that had initially been in Valladares' possession and found 7.2 grams of cocaine. They also searched the trunk of Valladares' car and discovered a suitcase containing more cocaine and a cocaine testing kit. A search of Minium's person revealed some LSD.

Valladares was charged with the unlawful delivery of a controlled substance (cocaine); the unlawful possession of a controlled substance (cocaine); and, with Minium, was charged with conspiracy to commit the offense of delivery of a controlled substance (cocaine).

Valladares' trial counsel made an "Omnibus Application" for suppression of physical evidence in the State's possession based on an alleged illegal search. This would have included the warrantless searches of Valladares' briefcase and suitcase following his arrest. At the "Omnibus Hearing", however, Valladares' lawyer affirmatively withdrew the motion to suppress the physical evidence.

Prior to trial Valladares' attorney interviewed Barbara

Campbell, who was expected to testify for the State. At the time she expressed some concern about testifying against Valladares. Shortly thereafter she disappeared and, despite a good faith effort to subpoena her, the prosecution was unable to obtain her presence at trial. Upon that turn of events defense counsel made a motion in limine to exclude, as hearsay, any statements made by Barbara Campbell to officers Sexton or Fisher. The trial court denied the motion, holding the statements were admissible under ER 804-(b)(3), as statements against the penal interest of an unavailable declarant.

Following a joint trial of Valladares and Minium, the jury rejected an entrapment defense and found Valladares guilty of all three charges. On the other hand, Minium was found guilty of possession but not guilty of the conspiracy charge. All convictions were affirmed by the Court of Appeals.[1]

Valladares' petition for review raises three principal issues: (1) the admission of Barbara Campbell's inculpatory hearsay statement as a statement against penal interest under ER 804(b)(3); (2) the conviction of Valladares for conspiracy despite the acquittal of his alleged coconspirator; and (3) the trial court's refusal to suppress evidence seized in the warrantless searches of Valladares' briefcase and suitcase.

I

ADMISSION OF INCULPATORY HEARSAY STATEMENTS

The prosecution established that despite a good faith effort, it was impossible to obtain Barbara Campbell's presence. Thereafter the trial court permitted Sexton and Fisher to relate the inculpatory statements made to them by Campbell. They were deemed admissible under ER 804-(b)(3).

First, Valladares urges this court to hold that hearsay statements made against penal interest which inculpate an accused are per se inadmissible. This position is not well

---

[1]This opinion addresses only the issues raised by Valladares' petition for review.

taken. In *State v. Parris*, 98 Wn.2d 140, 654 P.2d 77 (1982) this court aligned itself with the weight of federal case authority holding that inculpatory statements are admissible under the same standard ER 804(b)(3) sets for exculpatory statements. *United States v. Alvarez*, 584 F.2d 694 (5th Cir. 1978); *see also United States v. Riley*, 657 F.2d 1377 (8th Cir. 1981); *United States v. Palumbo*, 639 F.2d 123 (3d Cir. 1981); *United States v. Garris*, 616 F.2d 626 (2d Cir.), *cert. denied*, 447 U.S. 926 (1980).

In adopting the ER 804(b)(3) standard three basic prerequisites were delineated. First, the declarant must be unavailable despite good faith efforts to locate him or her. Second, the declarant's statement must so far tend to subject him or her to criminal liability that a reasonable person would not have made the statement unless he believed it to be true. Finally, the statement must be accompanied by corroborating circumstances indicating its trustworthiness.[2] *United States v. Sarmiento–Perez*, 633 F.2d 1092, 1098 (5th Cir. 1981). The first of the three requirements has been met. Clearly Campbell was the declarant. Further, there is no serious contention that she was available despite a good faith effort to locate her.

Valladares asserts, however, that the second prerequisite has not been met. It is urged Campbell's statements are not reliable because they were made under custodial circumstances and were not sufficiently against her penal interest. We do not agree.

---

[2]ER 804(b)(3) provides in pertinent part:

"**(b) Hearsay Exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

" . . .

"(3) *Statement Against Interest.* A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil, or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."

Campbell was not in custody. Rather, she was a self-admitted patient in a hospital at the time she summoned Detective Fisher. Far from being given in a coercive atmosphere, Campbell's statement to Fisher was wholly voluntary. Later, she willingly repeated it to Agent Sexton. There is little question that, based on her own statement, Campbell could have been tried on any of several narcotic-related charges. In addition, there is no evidence either officer sought to offer immunity or some other reward for the statements. Under the attendant circumstances she had more to gain by telling the truth and any inaccuracy in her statement could easily have been discovered. Further, Sexton's offer to pay her debt to Valladares was made only *after* she had repeated the statement to him. Under the instant facts, we can only conclude the statements made to Detective Fisher and Agent Sexton so tended to subject Campbell to criminal liability that a reasonable person would not have made them unless believed to be true.

Finally, Valladares contends the statements fail to meet the third prerequisite in that they are not accompanied by corroborating circumstances clearly indicating their trustworthiness. We do not agree with the assertion.

In the case at hand there are sufficient corroborating circumstances provided by Valladares' own incriminating statements to establish the trustworthiness of the Campbell statements. For example, she was able to arrange a meeting with Valladares whom she stated was her source of drugs. More importantly, at that meeting Valladares himself corroborated everything Campbell had disclosed earlier to Fisher and Sexton. He volunteered to sell narcotics to Sexton, disclosed that he had a "corner" on the drug market in the area, discussed how much he sold each week, bragged about the quality of his merchandise, acknowledged that Campbell had sold narcotics for him, and that she owed him $1,000. He also accepted Sexton's offer to pay Campbell's debt. In addition, at other prearranged meetings Sexton actually purchased two separate quantities of cocaine prior to the major purchase which is the subject of this

action.

In the final analysis, in testifying about Campbell's statement, Fisher and Sexton actually revealed no more than Valladares himself volunteered. Moreover, Valladares himself revealed far more incriminating information to Sexton than was said to have been revealed by Campbell's challenged statements. Under the circumstances here it is clear the testimony concerning Campbell's extrajudicial statements carried with it the "particularized guarantee of trustworthiness" necessary to support the mission of the confrontation clause of the Sixth Amendment. The requirements of *Ohio v. Roberts,* 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980) have been met. *See also State v. Parris, supra* at 148.

## II

As indicated earlier Valladares and Minium were charged with conspiring to commit the offense of delivery of a controlled substance (cocaine). Minium was acquitted on the conspiracy charge, but Valladares was found guilty. Valladares contends the acquittal of his only alleged coconspirator mandates a reversal of his conspiracy conviction. We agree.

RCW 9A.28.040(2)(d) provides that it shall not be a defense to a charge of criminal conspiracy that the person with whom the accused is alleged to have conspired has been acquitted. In this regard, the Washington Legislature appears to have adopted a unilateral approach to conspiracy by focusing on the culpability of the individual actor. At the same time, however, RCW 9A.28.040(1) makes *an agreement* with one or more persons a necessary element of the crime of conspiracy. This raises the ultimate question of whether, in a *joint trial* on the same facts, one can be convicted of conspiracy when his alleged coconspirator has been found not to have entered into any alleged agreement and no conspiracy with an unnamed coconspirator has been alleged.

Clearly failure to prosecute the only coconspirator,

or an inconsistent disposition or inconsistent verdict in a *different* trial, would not affect a defendant's guilt. RCW 9A.28.040(2)(d). But, conviction of a defendant accompanied by the acquittal of the only alleged coconspirator in a *joint* trial, when no unnamed coconspirators have been alleged, necessarily leads to inconsistent verdicts within the same trial. One verdict would recognize the existence of the requisite corrupt agreement and the other would deny its existence. It is not logical to assume the Legislature intended such a result in *joint* trials of coconspirators. It is logical to assume, however, RCW 9A.28.040(2)(d) was intended to apply only to the effect of inconsistent verdicts in separate or different trials of alleged coconspirators.

The State suggests that the verdicts are not in fact inconsistent because the jury could have found Valladares conspired with Agent Sexton to deliver cocaine to Agent Greppin. The difficulty with such a theory is that Valladares was specifically charged with conspiring with Minium. He was neither charged with having conspired with Sexton nor with having conspired with some other unnamed coconspirators. We need not decide here what result might have been reached had there been such a charge. It is sufficient to say an accused must be informed of the charge against him and he cannot be tried for an offense not charged. The State did not charge Valladares with having conspired with Sexton or with having conspired with some unnamed coconspirator. Thus, the information was not sufficient to support the State's theory. *State v. Rhinehart*, 92 Wn.2d 923, 602 P.2d 1188 (1979).

### III

Valladares' last assignment of error asserts that although he did not object to the admission of evidence seized in a warrantless search of his suitcase and briefcase, he may now raise the issue for the first time on appeal because it is an issue of constitutional magnitude. RAP 2.5(a)(3). The Court of Appeals rejected the assignment of error, holding Valladares had waived or abandoned his constitutional

rights by affirmatively withdrawing his pretrial motion to suppress the evidence. We agree.

By affirmatively withdrawing his motion to suppress the evidence, Valladares elected not to take advantage of the mechanism provided him for excluding the evidence. Valladares thus waived or abandoned his Fourth Amendment objections. *See State v. Rice,* 24 Wn. App. 562, 603 P.2d 835 (1979); 3 W. LaFave, *Search and Seizure* § 11.1, at 474 (1978). In a remarkably similar situation, wherein trial counsel affirmatively withdrew a Fifth Amendment objection to a prosecution, Mr. Justice Douglas had this to say:

> We can only conclude that petitioner expressly waived any objection to the prosecutor's comment by withdrawing his exception to it and by acquiescing in the treatment of the matter by the court. It is true that we may of our own motion notice errors to which no exception has been taken if they would "seriously affect the fairness, integrity, or public reputation of judicial proceedings." But we are not dealing here with inadvertence or oversight. This is a case where silent approval of the course followed by the court *is accompanied by an express waiver of a prior objection to the method by which the claim of privilege was treated.*

(Citations omitted. Italics ours.) *Johnson v. United States,* 318 U.S. 189, 200, 87 L. Ed. 704, 63 S. Ct. 549 (1943).

The constitutional challenge having been waived or abandoned, we will not consider it further.

We affirm the Court of Appeals with respect to the convictions for unlawful delivery of a controlled substance and unlawful possession of a controlled substance. We reverse the Court of Appeals on the conspiracy charge.

BRACHTENBACH, DOLLIVER, DORE, and DIMMICK, JJ., and THOMPSON, J. Pro Tem., concur.

WILLIAMS, C.J. (concurring specially)—I concur in the result reached by the majority. However, on the issue of admission of hearsay testimony, I believe the case should be decided on the basis of my dissenting opinion in *State v.*

*Parris*, 98 Wn.2d 140, 654 P.2d 77 (1982). Apart from my belief that inculpatory hearsay statements are not admissible under Rule of Evidence 804(b)(3), *see Parris*, at 155–64 (Williams, J., dissenting), I believe we are required to independently analyze such statements for compatibility with defendant's separate and distinct right of confrontation. Though the confrontation clause and hearsay rules are intended to protect the same values, the two are not coextensive. It is possible to find a violation of the confrontation clause even though certain out–of–court statements are admissible under a recognized hearsay exception. *California v. Green*, 399 U.S. 149, 155–56, 26 L. Ed. 2d 489, 90 S. Ct. 1930 (1970) (citing *Barber v. Page*, 390 U.S. 719, 20 L. Ed. 2d 255, 88 S. Ct. 1318 (1968); *Pointer v. Texas*, 380 U.S. 400, 13 L. Ed. 2d 923, 85 S. Ct. 1065 (1965)).

The majority seems to recognize the necessity of independent analysis of the confrontation clause but fulfills this obligation by only looking to the Sixth Amendment. In so doing, it quite rightly concludes that the questioned evidence was imbued with a particular guaranty of trustworthiness as required by *Ohio v. Roberts*, 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980). Despite the accuracy of this conclusion as it applies to federal guaranties such a determination is wholly insufficient to protect those interests guaranteed by our own constitution.

It is now firmly established that this court may interpret the Washington Constitution as more protective of individual rights than parallel provisions of the United States Constitution. *State v. White*, 97 Wn.2d 92, 108, 640 P.2d 1061 (1982); *see also PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 81, 64 L. Ed. 2d 741, 100 S. Ct. 2035 (1980) (citing *Cooper v. California*, 386 U.S. 58, 17 L. Ed. 2d 730, 87 S. Ct. 788 (1967)). Independent analysis becomes even more imperative when, as here, the language of the state provision substantially differs from the federal. *State v. Simpson*, 95 Wn.2d 170, 177–82, 622 P.2d 1199 (1980).

The sixth amendment to the United States Constitution simply gives the accused the right to be confronted with

witnesses.

By contrast, Const. art. 1, § 22 provides:

In criminal prosecutions the accused shall have the right . . . to meet the witnesses against him *face to face* . . .

(Italics mine.)

As I stated in the *Parris* dissent, the "face–to–face" language of Const. art. 1, § 22 seems to require actual *physical* confrontation between the accused and any adverse witnesses. And while the impracticality of actual physical confrontation is not disputed, it also cannot be disputed that this language at least provides greater protection than is afforded under both hearsay rules and the Sixth Amendment. Though I by no means believe that the right of confrontation is absolute, I do believe that under the Washington Constitution, this right must be more jealously guarded than similar rights under the Sixth Amendment. To this end, any examination of the extent of this protection must include a careful balancing of the competing interests of the State and the accused with added weight being placed upon the accused's side of the scale.

Even using more generalized concepts of balancing, the defendant's interest in avoiding the cumulative effects of the statements outweighed the State's need for admission. Campbell's statements identified the defendant as a former drug dealer and formed the initial basis for the State's charge of continuing drug dealings. Despite the importance of these facts to the State's case, there still existed overwhelming evidence tending to prove these very same facts. Thus, exclusion of Campbell's statement presented no danger to the State. Under these circumstances, the balance should have been struck in the defendant's favor. The trial court thus committed error in admitting Campbell's out–of–court testimony.

Despite what I consider to be a clear violation of the defendant's rights, I would still affirm the defendant's conviction. Under the doctrine of harmless error not every constitutional infirmity at trial requires reversal. This doc-

trine may be applied even when a right of confrontation is asserted. *State v. Braun,* 82 Wn.2d 157, 165, 509 P.2d 742 (1973); *see also Harrington v. California,* 395 U.S. 250, 23 L. Ed. 2d 284, 89 S. Ct. 1726 (1969). In *State v. Evans,* 96 Wn.2d 1, 5, 633 P.2d 83 (1981), this court found an error harmless beyond a reasonable doubt where the record revealed that there was "overwhelming evidence supporting the jury's verdict." In this case, the defendant's own statements and the testimony from the various police officers provided what can only be considered *overwhelming* evidence to support the conviction. The evidence admitted via the Campbell statements, though constitutionally improper, was thus harmless. I therefore must concur in the result reached by the majority.

UTTER, J., and CUNNINGHAM, J. Pro Tem., concur with WILLIAMS, C.J.

Reconsideration denied August 2, 1983.