IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>MAYGAG ALI WARSAME,<br><br>Appellant. | No. 86161-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUNG, J. — Maygag Warsame was convicted of trafficking in the first degree, rape in the second degree, and attempting to elude a pursuing police vehicle based on events that occurred during the late evening and early morning of August 28 and 29, 2023. On appeal, Warsame challenges the sufficiency of evidence to convict him for trafficking. He also claims he was denied his right to counsel of choice because the court denied him a continuance for the purpose of substituting counsel and denied a separate motion to substitute counsel. Finally, he challenges a community custody condition requiring him to remain within geographic boundaries "as set forth in writing by the Department of Correction[s] Officer [sic] or as set forth with a [Stay Out of Drug Area (SODA)] order." We reject Warsame's claims and affirm.

FACTS

At the time of the events at issue, S.W. lived in the Seattle area with her boyfriend Aidan Osborne. S.W. worked independently as a sex worker.

Around 9 p.m. or 10 p.m. on August 28, Osborne dropped S.W. off at an IHOP restaurant parking lot near Aurora Avenue. Osborne planned to wait in the car while S.W. worked and then take her to the motel room where the two were staying. At some point after dropping off S.W., Osborne fell asleep.

S.W. crossed the street and went a block or two north. After standing around for at least one hour, two men approached S.W. and attempted to solicit her services. S.W. was not interested in serving the two men because they had no vehicle and wanted her to serve them both at the same time in a dark alley. Though S.W. said no, the men continued to pursue her. As S.W. was walking away from the two men, Warsame drove up next to S.W., asked S.W. if the men were bothering her and offered her a ride, which she accepted.

S.W. asked Warsame to drop her off at the motel where she and Osborne were living. According to S.W., Warsame drove in the opposite direction of the motel to a 76 gas station on Greenwood Avenue. There, Warsame and S.W. took hits of fentanyl and methamphetamine. Warsame then asked her about her business and whether she had a manager or a "pimp" and suggested S.W. post advertisements online. Warsame also gave S.W. a can of pepper spray, told S.W. that she needed something to protect herself with, and showed S.W. what appeared to her to be two guns,[1] stating, "This is what I got to protect myself and nobody's gonna mess with me." S.W. testified that Warsame told her that if she was bothered by other "pimps" in the future, she should tell them that she was being managed by him.

---

[1] The objects Warsame showed S.W. were in fact a black BB gun and a small folding knife shaped like a gun in camouflage print.

2

Warsame then put a belt around S.W.'s neck "like a leash and pulled it tight" and used the belt to manipulate S.W. into kissing him. According to S.W., Warsame told her that he likes girls who learn quickly and don't need to be "checked." S.W. also testified that Warsame told her that she worked for him, he was going to post ads online for her, and she was "to go out on Aurora and basically do what [she] was already doing except come back and give him all the money." He also gave S.W. specific hours he wanted her to work in the future.

Warsame then drove away from the 76 gas station and parked behind a Shell gas station, where he checked under the hood of his car. Then, he drove to an AMPM gas station. At the AMPM, Warsame ordered S.W. to go inside and pay for his gas with cash he gave her. He told S.W. to not "try anything funny" with him because he didn't "have any problem checking a bitch." When S.W. went inside to pay for the gas, she connected to wi-fi and attempted to reach Osborne through Facebook Messenger. She wrote:

> Babe, I need help. 9-1-1 emergency. This dude is scaring me. I got into this black dude's car on accident and now he wants to pimp me out and I'm scared because he's got two guns and wants me to follow orders and shit. I'm gonna send you my location, but don't come until I say it's cool.

She shared her location and then sent more messages, including, "Please wake up. Please be in Wi-Fi." and "I'm scared. Like really fucking scared."

When S.W. returned to Warsame's car and gave him the money, he looked at her phone screen, which she had switched to chats with her brother so that Warsame would not know she was asking Osborne for help. She had to "reassure [Warsame] over and over that it was [her] real brother." Warsame was "[v]ery irritated and getting really

3

angry" and "ordered" S.W. to eat a "bizarre concoction" of cereal, nuts, and white chocolate, telling her he used his last bit of milk in the bowl "so [she] better appreciate it."

Then, someone Warsame knew approached the car holding a gas can, told Warsame that he had been robbed, and asked Warsame for drugs. When S.W. said, "[o]h that sucks" and "I'm sorry," Warsame gave her what she described as a "death glare." When the person asked S.W. for her name, Warsame told him that S.W. "doesn't speak unless I tell her she can." After that person left, Warsame told S.W. that she was "lucky" he did not punish her for speaking out of turn. He again expressed that he could "check" her or "beat the shit out of" her.

Warsame then drove S.W. to an alley behind the AMPM. He told S.W. he wanted to see "what he was working with" and forced S.W. to perform oral sex against her will. He told S.W. that she was "lucky" that he "doesn't beat his girls in front of his friends" because what she had done "totally warranted it." S.W. testified that he digitally raped her and put his fingers into her mouth afterwards. Then, he ordered S.W. to change positions and he spanked her bare skin so hard it hurt for her to sit down after. He repeated this cycle three or four times. While doing so, Warsame told S.W. that she "didn't have any friends," "never did have any friends," and "[didn't] have any family." He also told her that she was going to "go out and make him some money," the only people she could "fuck with" was him and her brother who she was messaging earlier, and that any of Warsame's friends who wanted to "try [her] out" could do so. He told S.W. that she was not going back to her boyfriend "and if he had a problem with it then [Warsame]

4

was gonna smoke him." Further, Warsame told S.W. she could not contact anyone or do anything unless he "explicitly ordered" her to.

Eventually, S.W. asked Warsame if she could use the bathroom and suggested the IHOP across from the AMPM, where she knew Osborne was still parked. Warsame drove to the IHOP but did not stop his car once he saw Osborne's car in the parking lot. He told S.W. that Osborne did not "give a fuck" about her. He then told S.W. he would drive her to a Shari's restaurant to use the restroom. At the Shari's, Warsame asked S.W. how long she was going to take and whether she was going to urinate or defecate. Warsame demanded S.W. give him her phone and unlock it, telling her he would "beat the crap out of" her if she didn't. He told S.W. she could not have her phone back until she made money to pay him back for "all the drugs that [she] did and for playing [him]." He told her she needed to pay him back $150, even though she had used "maybe five dollars' worth of drugs."

However, Warsame did not let S.W. out of the car to use the bathroom in the Shari's and instead moved his car to a different parking lot near a Starbucks. He told S.W. to go make money and that he would hold her phone and purse until she did so. S.W. proposed texting one of her friends to ask for money. Instead of allowing S.W. to text her friend, Warsame himself used S.W.'s phone to text the friend for money. Warsame then smoked more fentanyl and eventually began "dozing off" from the fentanyl high. S.W. used the opportunity to escape and ran to the Starbucks, where she used the store phone to call Osborne and 9-1-1.

Seattle police officers responded and located Warsame's vehicle, which matched the one described by dispatch. When officers attempted to stop Warsame, he

5

accelerated to a high rate of speed, prompting a vehicle pursuit. Warsame led police on a high speed chase of up to 79 m.p.h. on Aurora Avenue, colliding with two vehicles on a residential street and swerving into the opposing lane of traffic. Ultimately, Warsame's vehicle crashed into vehicles stopped at a red light and parked vehicles, where it stopped. Thereafter, Warsame was taken into custody.

Warsame was charged with trafficking in the first degree, rape in the first degree, and attempting to elude a pursuing police vehicle. Prior to June 2023, the case was continued six times. In June 2023, the court continued trial to September 2023 based on the prosecutor's prescheduled time off and defense counsel's other trial. Though his counsel agreed, Warsame objected to this continuance.

Trial convened on September 6, 2023, before Judge Hillary Madsen ("the court"). The State sought another continuance, and defense counsel deferred to the court. The court reserved to discuss scheduling with Chief Criminal Judge Ketu Shah. The following day, the court denied the continuance motion.

Trial reconvened on September 11, and voir dire and jury selection were completed by September 12. The next day, however, two of the jurors were absent due to COVID-19, leaving only 12 jurors and no alternates. The court determined it would be too risky to proceed without alternates, but it lacked authority to recess the case for two weeks per Judge Shah. The court opened the floor for parties to "make the record that they need[ed] to make" before sending the parties to appear before Judge Shah that afternoon. The State proposed an expedited voir dire. In response, Warsame's counsel, Phillip Su, expressed a preference that the court recess, citing "quasi-professional and financial issues that are in jeopardy" and expressing that it would not be "fair that Mr.

Warsame has counsel whose mind is distracted and not able to perform in his highest capability."

Later, before Judge Shah, Su reiterated his concerns, remarking that he was leaving his law firm and that proceeding to trial would "cause a lot of personal and financial hardship" and would be "ineffective assistance of counsel." After discussion, Judge Shah set a status hearing for October 6 and anticipated scheduling trial for October 16 or 23, "depending on counsel's schedule."

At a status hearing before Judge Shah on October 6, defense counsel sought a continuance. There, Su disclosed to the court that there were "collateral issues" between him and his former employer that were "going to be detrimental to Mr. Warsame." He asked the court to "at the very least, consider giving us a one- to two-week continuance" in addition to "setting a special motion so we can decide what we want to do and the relief we can get." Su stressed that he was willing to resume the trial, but "at the current juncture, [he] can't do that on [his] own." The court then asked to hear from Warsame, who began disclosing details concerning Su and his former law firm. The court interrupted Warsame to avoid "get[ting] in the middle of something that may be future litigation," adding, "right now, the relevant issue is whether we go to trial or not. So if you have something to say about that, I'm happy to hear from you." Warsame responded, "I would like to hold up on trial and discuss things . . . . And I would like to discuss more with my family about . . . there's nothing I can really say, without saying some --." The court again interjected and clarified to Warsame that it "underst[oo]d [he] would like an extension. And that's sufficient." Warsame thanked the court without further comment. The court said it "was inclined to have this case go forward on the

7

16th" but it would be before a judge other than Judge Madsen and asked the parties for their preferences for dates. The State asked for whatever date was sooner, and Su requested a date at least two weeks away and in front of Judge Madsen. The court stated it would try to get the case scheduled "on the 16th, or very close to that, with Judge Madsen."

Counsel for the parties next appeared for a status conference before Judge Shah on October 17, 2023. Both parties indicated they were ready for trial, and the court directed them to Judge Madsen's courtroom. There, Su appeared with co-counsel from his former law firm. Warsame personally addressed the court and raised concerns about deficiencies in his attorney's work and competence, as well as the potential conflict between his attorney and his former law firm. The court asked, "[A]re you asking for substitution of counsel, meaning do you want a new attorney?" and Warsame responded, "Yeah. Yes." As to whether he wanted the court to appoint a public defender or wanted more time to find another private attorney, he stated that he "would go for [a] public defender." The court denied the motion, explaining as follows:

> All right. So just to be clear . . . there are certain decisions that can be made by your assigned trial judge, and there are certain decisions that are made by the Chief of criminal. And the reason that we have that separation is because Chief Criminal ultimately is responsible for the workload of the entire department. And so the concern that I have is that folks are coming here from Judge Shah, Chief Criminal, and Judge Shah heard the motion to continue. And Judge Shah decided it.
> . . . .
> So it is the understanding of this court that when we are in trial and a request is made to substitute counsel, the court needs to consider the reasons for the dissatisfaction. The court needs to consider its own evaluation of the attorney. And then the court has to consider the effect of the substitution upon the scheduled proceedings. And so in taking into account each of those factors, this court will not grant your request to have a new attorney at this time, the court is going to deny the motion at this time.

8

The court recessed on October 17 and resumed the following week on Monday, October 23 for voir dire. The court tabled discussion of Warsame's motion to substitute counsel for after jury selection. At the end of the day, the court returned to the issue of the motion, stating that regarding the motion to substitute counsel,

> [T]he court does need to make certain findings . . . . I want folks to understand that the court did deny the motion for substitution of counsel, and the court will continue to deny the motion for substitution of counsel so that, folks, you're not like on pins and needles overnight. And the court will flesh that opinion out tomorrow.

As the court proceeded to discuss scheduling, Warsame interjected "to apologize for trying to fire my attorney" as he "was having a bad day." The court asked, "Would you like to withdraw your motion?" to which Warsame responded "Yeah."

Warsame was convicted of trafficking in the first degree, rape in the second degree, and attempting to elude a pursuing police vehicle. For attempting to elude a police vehicle, Warsame was sentenced to 41 months incarceration. For the trafficking conviction, Warsame was sentenced to 336 months incarceration and 18 months of community custody, including a condition requiring him to "[r]emain within geographic boundaries, as set forth in writing by the Department of Correction[s] Officer [sic] or as set forth with a SODA order." Warsame timely appeals.

## DISCUSSION

On appeal, Warsame argues that there was insufficient evidence for his conviction of trafficking in the first degree because S.W. did not perform a commercial sex act. He also contends the trial court's October 6 denial of his continuance request and its October 17 denial of his motion to substitute counsel unconstitutionally deprived him of his right to counsel of choice. Finally, Warsame challenges a community custody

9

condition requiring him to remain within geographic boundaries "as set forth in writing by the Department of Correction[s] Officer [sic] or as set forth with a SODA order."

I.  Sufficiency of the Evidence

Whether sufficient evidence supports a defendant's conviction is a question of law that we review de novo. State v. Rich, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). A claim of insufficient evidence admits the truth of the State's evidence and all reasonable inferences from that evidence. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). All reasonable inferences must be interpreted in favor of the State and most strongly against the defendant. Id. Evidence is sufficient if " 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " State v. Green, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).

Warsame contests the sufficiency of the evidence regarding the second element of trafficking in the first degree, which the "to-convict" instruction describes as requiring that the defendant "recruited, harbored, transported, or obtained, by any means, [S.W.], knowing, or in reckless disregard of the fact, that force, fraud, or coercion would be used to cause [S.W.] to engage in a commercial sex act." See also RCW 9A.40.100(1)(a)(i). Warsame argues that the State failed to prove causation; as "no commercial sex act occurred," it was "sheer speculation S.W. would ever be forced at some future point to engage in a commercial sex act."

It is undisputed that no commercial sex act occurred here. As for the legal question of whether proof of a commercial sex act is required to convict a person of

trafficking in the first degree, this court has held that it is not. In State v. Braun, among other challenges to his conviction for trafficking in the first degree, Braun claimed insufficient evidence established causation and that "the evidence lacked a connection between his violence, threats of violence, and misrepresentations sufficient to compel [the victim] to engage in prostitution." 20 Wn. App. 2d 756, 791, 502 P.3d 884 (2022). This court disagreed, reasoning as follows:

> RCW 9A.40.100 does not require that the State prove that any sexual act actually occurred. United States v. Maynes, 880 F.3d 110, 114 (4th Cir. 2018). Because the statute employs the future tense, the sex act is not an element of the offense. The offender completes the crime [of human trafficking under RCW 9A.40.100] when he recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits a person knowing, or in knowing reckless disregard thereof, that means of force, fraud, or coercion of such means will be used to cause the person to engage in a commercial sex act. [Maynes, 880 F.3d at 114.]

Id. at 793. The court held there was sufficient evidence of causation where "Braun recruited, enticed, harbored, transported, advertised, and maintained [the victim] while knowing that he and others *would impose* force, coercion, and fraud on her for her sexual favors." Id. at 794 (emphasis added).

Warsame relies on the language in Braun that "[a] defendant commits the crime of trafficking *even if the commercial sex act comes in the future* as long as he knew that force, fraud, or coercion would be employed to cause the victim to engage in the act," id. at 794 (emphasis added), to suggest that there must still be evidence that a commercial sex act occurred at some point. But as the State points out, this statement was based on the facts in Braun, where the victim was forced to engage in numerous commercial sex acts over the course of years. Id. at 775-77. But on the legal question

Warsame poses, the court in Braun expressly stated, "RCW 9A.40.100 does not require that the State prove that any sexual act actually occurred." Id. at 793.

We have looked to cases analyzing the federal trafficking statute, 18 U.S.C. § 1591, to analyze the state analog, RCW 9A.40.100. See Braun, 20 Wn. App. 2d at 793-94. Federal law is clear that "there is no such requirement" that the defendant's act in fact caused a commercial sex act; "the crime is complete when the defendant recruits, entices, harbors, etc., the victim with knowledge that the prohibited means will be used in the future to cause them to engage in commercial sex acts." Maynes, 880 F.3d at 114.

Despite the clear holdings in Braun and Maynes, Warsame suggests that if a commercial sex act does not occur, the statute requires proof that the commission of a commercial sex act is "a looming reality," citing United States v. Wearing, 865 F.3d 553 (7th Cir. 2017), and United States v. Garcia-Gonzalez, 714 F.3d 306 (5th Cir. 2013). In Wearing, the defendant recruited a 15-year-old girl to engage in sex work and scheduled a client visit at a hotel. 865 F.3d at 554. No commercial sex act took place because "the client felt that it was too risky" given that the "police were at the hotel for an unrelated matter." Id. The court interpreted the phrase "'knowing . . . the person . . . will be caused to engage in a commercial sex act'" to "describe[ ] the acts that the defendant intends to take." Id. at 556. Wearing does not suggest proof of the crime requires an imminent commercial sex act that is thwarted by an intervening force, as Warsame argues. Rather, the punishable activities are "the acts that the defendant intends to take - that is, that he means to 'cause' the minor to engage in commercial sex

acts . . . . [T]he statute uses the future tense to describe the defendant's plan for the victim at the time he recruits her." Id. at 556.

Similarly, Warsame's reliance on Garcia-Gonzalez is misplaced. In Garcia-Gonzalez, the defendant smuggled two minor sisters from Honduras into the country "under false pretenses that they would be working in a restaurant." 714 F.3d at 313. The defendant bought the sisters revealing clothing, "proposed that [they] engage in prostitution, told them how much to charge for sex, and arranged the sexual encounters." Id. He also "threatened that he would harm the sisters' family if they tried to escape." Id. The court did not make the distinction that Warsame suggests, i.e., that in that case, the "looming reality" of being forced to engage in a commercial sex act was dispositive, whereas in this case, there was only "sheer speculation." Instead, the court held that completion or near-completion of a commercial sex act is not a required element. Garcia-Gonzalez, 714 F.3d at 312.

Accordingly, we reject Warsame's argument that a conviction for trafficking in the first degree requires proof that a commercial sex act actually occurred. And based on the evidence presented at trial, a rational trier of fact could have found beyond a reasonable doubt that Warsame acted knowingly and used force and coercion on S.W. to cause her to engage in "a sexually explicit act, or a commercial sex act," as required by RCW 9A.40.100. Warsame deliberately engaged in acts to establish power and control over S.W. For example, he put a leash around her neck and told her she belonged to him, raped her, and threatened to beat her repeatedly. Although he did not actually possess a firearm, Warsame intentionally led S.W. to believe that he did and that he would not hesitate to use it if she did not follow his orders. Warsame also

projected to S.W. and others that he had control over her and planned to use his control to force her to engage in commercial sex acts. For example, Warsame told S.W. that she worked for him and gave her specific hours he wanted her to work; told her that she no longer had friends or family and that she could have sex only with Warsame, her brother, clients, or Warsame's friends; and told a third party that S.W. "doesn't speak unless I tell her she can." S.W. testified repeatedly and consistently that Warsame's actions made her afraid to object to him, disobey him, or try to escape from him. When S.W. texted her boyfriend for help, she wrote that Warsame's actions made her afraid and that she felt like she had to follow his orders. S.W. testified that she did not even consider using the pepper spray Warsame gave her against him because she thought he had a real gun that he could shoot in the time it would take her to access and activate the pepper spray. Further, the State's expert witness testified that Warsame's conduct was a regular recruitment technique "in the prostitution subculture" called "knocking." Recruiters will park their cars next to sex workers on the street, "try to attract the attention of those individuals and talk to them and see if they can get them to join their team," then assert control over the sex worker by aggressively talking down to them, asserting "their physical presence, and . . . demeanor," "correct[ing]" behavior "if they catch their person not doing the things they were supposed to do," "look[ing] for vulnerabilities that the individual has," and "us[ing those vulnerabilities] as a way and a means to gain control of them, and get them to work for them." Based on this record, a rational trier of fact could find Warsame guilty beyond a reasonable doubt of all elements of RCW 9A.40.100(1)(a).

14

II. Denial of Continuance Requests

Warsame challenges the trial court's denials of his October 6 continuance request and October 17 motion to substitute counsel as the unconstitutional deprivation of his right to counsel of choice. We disagree that the trial court erred in denying these requests.

Motions to continue are within the typical discretion of the trial court. See State v. Hampton, 184 Wn.2d 656, 670, 361 P.3d 734 (2015). Similarly, a trial court has discretion to grant or deny a motion to substitute counsel. State v. Zimmerman, 34 Wn. App. 2d 81, 104, 566 P.3d 855 (2025). "Discretion is abused when the trial court's decision is manifestly unreasonable, or is exercised on untenable grounds, or for untenable reasons." State v. Blackwell, 120 Wn.2d 822, 830, 845 P.2d 1017 (1993). "In exercising discretion to grant or deny a continuance, trial courts may consider many factors, including surprise, diligence, redundancy, due process, materiality, and maintenance of orderly procedure." State v. Downing, 151 Wn.2d 265, 273, 87 P.3d 1169 (2004). A trial court does not abuse its discretion in denying a continuance even where "reasonable minds may differ" as to how the court should have weighed the "reasons for granting the continuance . . . against the reasons for denying the motion." Id. at 274.

Specifically, "when [a court is] deciding a motion to continue for the purposes of substituting counsel," the Washington Supreme Court has identified 11 non-exclusive factors that the court may consider. Hampton, 184 Wn.2d at 669. While "[t]he Sixth Amendment right to counsel generally includes the right to select and be represented by counsel of the defendant's choice," State v. Johnston, 143 Wn. App. 1, 22, 177 P.3d

15

1127 (2007), a limit to this right is " 'a trial court's wide latitude in balancing the right to counsel of choice . . . against the demands of its calendar.' " Hampton, 184 Wn.2d at 736-37 (quoting U.S. v. Gonzalez-Lopez, 548 U.S. 140, 152 (2006)).

Warsame argues that the purpose of the October 6 continuance request was to substitute counsel and, therefore, the reviewing court must analyze the Hampton factors to determine whether there was an abuse of discretion. But at no point during the hearing on October 6, 2023, did Warsame request new counsel or suggest that the purpose of a continuance was to seek new counsel. Instead, Warsame argues that the request for new counsel was implied by his statement to the court on October 6 that there was "a lot going on with the law firm" and that Su had been locked out of the files. He also argues that his and Su's discussion of the refund sought by Warsame's family constituted an expression of desire to substitute counsel. However, Su merely explained that he had learned that Warsame's family was not aware that he had left his firm and was trying to get a refund from the firm. Su stated that Warsame "understands that there are a lot of moving parts that are going on right now," and based on "collateral issues" between Su and his former employer, resuming trial on the scheduled date of October 16 would be "detrimental to Mr. Warsame, especially on the outcome of his case. Su asked the court either for a one- to two-week continuance or "setting a special motion [the next week] so we can decide what we want to do and the relief that we can get." Rather than indicating any intent to withdraw, Su noted that he was familiar with the case and was willing to resume trial, though he could not "do that on [his] own." Then, when the court stated to Warsame that it "underst[oo]d [he] would like an

16

extension," Warsame thanked the court without any indication that the purpose of the request was to substitute counsel.

In the absence of any mention of Su's intention to withdraw from the case or that, in light of Su's issues with his former firm, Warsame sought new counsel, the trial court did not abuse its discretion when it denied the October 6 continuance request. A court may deny a continuance if the "maintenance of orderly procedure outweighed the reasons favoring a continuance." Downing, 151 Wn.2d at 274 (court denied defendant's request for a continuance to secure an expert witness, in part because expert's testimony "would not likely have led to a different result"). Here, Warsame had previously expressed a desire to exercise his speedy trial rights, the case had already been continued seven times, and the State and its witnesses were ready for trial. Thus, because the court had tenable reasons to deny the October 6 continuance, it did not abuse its discretion.

At the October 17 hearing, unlike at the October 6 hearing, Warsame made a clear request to substitute counsel. When Warsame raised concerns about his attorney's work and the potential conflict between his attorney and his former law firm, after some discussion about these concerns, the court asked, "[A]re you asking for substitution of counsel, meaning do you want a new attorney?" Warsame responded, "Yeah. Yes." The court denied the motion "at this time."

When trial resumed on October 23, the court tabled further discussion of the motion for substitution until after jury selection that day. At the end of the day, the court returned to the issue of the motion, stating,

> [T]he court does need to make certain findings . . . . I want folks to understand that the court did deny the motion for substitution of counsel,

17

and the court will continue to deny the motion for substitution of counsel
so that, folks, you're not like on pins and needles overnight. And the court
will flesh that opinion out tomorrow.

As the court proceeded to discuss scheduling, Warsame interjected "to apologize for trying to fire my attorney" as he "was having a bad day." The court asked, "Would you like to withdraw your motion?" to which Warsame responded "Yeah."

The State argues that even if Warsame made a clear request to substitute counsel, he waived his request when he withdrew his motion and thus the issue is not reviewable on appeal. We agree. Even an error of constitutional magnitude may be waived if the underlying motion was affirmatively withdrawn. See, e.g., State v. Valladares, 99 Wn.2d 663, 671-72, 664 P.2d 508 (1983) (rejecting assignment of error to admission of evidence seized in a warrantless search on appeal because the defendant affirmatively withdrew his motion to suppress).[2]

Warsame contends that his withdrawal of his motion did not constitute a waiver because the court "had already denied Warsame's motion three times,"[3] and "any further argument would be a 'useless endeavor,' " relying on State v. Thang, 145 Wn.2d

---

[2] The State disputes whether the request to appoint a public defender in lieu of private counsel, Su, implicates the right of counsel and whether the Hampton factors apply, because in Hampton, the defendant requested retained counsel to replace appointed counsel, the reverse of the situation here. 184 Wn.2d 656 (2015). When the court asked Warsame if he wanted appointed counsel or wanted more time to find another private attorney, Warsame stated that he "would go for [a] public defender." "The right to counsel of choice does not extend to defendants who require counsel to be appointed for them." United States v. Gonzalez-Lopez, 548 U.S. 140, 151-52 (2006); see also State v. Sanchez, 171 Wn. App. 518, 541-43, 288 P.3d 351 (2012) (reiterating that right to counsel of choice does not apply to indigent defendants); Hampton, 184 Wn.2d at 662-63 ("[I]ndigent defendants with appointed counsel do not have the right to their counsel of choice.") However, given our disposition of Warsame's claim, we need not resolve whether the Hampton factors apply here.

[3] As an initial matter, as discussed above, Warsame did not request substitute counsel at the October 6 hearing. The record reflects that Warsame moved to substitute counsel on October 17, and the court denied his request that same day. Then, on October 23, the court revisited the motion and, after additional discussion, denied it while noting it needed to make findings on the record. Thus, at most, the court denied the motion two times, not three.

630, 41 P.3d 1159 (2002). But Warsame's reliance on Thang is misplaced. In Thang, after unsuccessfully challenging the admissibility of a witness's testimony concerning the defendant's prior offense, the defendant introduced preemptive testimony denying parts of the prior offense before it had been introduced by the State. Id. at 640-41. The court held that the defendant did not waive his objection to the testimony because "[w]aiver is the voluntary relinquishment of a right" and in those circumstances, where the defendant introduced testimony only because he had lost the motion to exclude another witness's testimony, he did not voluntarily relinquish his right to challenge admission of the testimony on appeal. Id. at 648.

In this case, unlike in Thang, Warsame was not compelled to take any action based on the court's ruling; rather, he affirmatively withdrew his motion, as the defendant did in Valladares. In Valladares, the defendant made an omnibus application for the suppression of physical evidence then affirmatively withdrew the motion at the omnibus hearing. 99 Wn.2d at 666. The court held that "[b]y affirmatively withdrawing his motion to suppress the evidence, Valladares elected not to take advantage of the mechanism provided [to] him for excluding the evidence. Valladares thus waived or abandoned his [constitutional] objections." Id. at 672. Like Valladares, Warsame elected not to take further advantage of the mechanism to seek substitute counsel. Regardless of whether continued pursuit of his motion to substitute counsel would have been futile, as Warsame suggests, the court had not yet made findings supporting its denial of the motion. Yet Warsame nevertheless affirmatively agreed when the court asked if he would "like to withdraw [his] motion." By taking such affirmative action, he waived his challenge to the court's ruling denying his motion. We have previously addressed a

similar situation in an unpublished case, State v. Anderson, No. 75074-7-I (Wash. Ct. App. Feb. 19, 2019) (unpublished), https://www.courts.wa.gov/opinions/pdf/750747.pdf.[4] There, the defendant "raised the issue of her Sixth Amendment right to counsel of choice in her initial motion for substitution, oral arguments, and in the motion for reconsideration," but later withdrew the motion and "affirmatively stated her desire to withdraw the request." Id. at 6. Even though the court rejected defendant's motion to substitute counsel multiple times prior to defendant's withdrawing it, this court did not hold the waiver involuntary. See id. As the facts and issue are analogous to those here, the reasoning in Anderson is persuasive, and we apply it to the facts in this case to reach the same conclusion: when Warsame withdrew his motion, he "waived any constitutional claim related to the trial court's rejection of" his motion to substitute. See id. at 6.

III. Community Custody Condition

Warsame initially challenged a community custody condition requiring him to remain within geographic boundaries "as set forth in writing by the Department of Correction[s] Officer [sic] or as set forth with a SODA order." At oral argument, Warsame acknowledged that this court recently addressed the same community custody condition in State v. Lundstrom, 34 Wn. App. 2d 977, 572 P.3d 1243 (2025), concluding that the condition was not unconstitutionally vague.[5] Based on the reasoning

---

[4] This court may cite to unpublished decisions that it deems necessary to a reasoned decision. GR 14.1(c).

[5] Wash. Ct. of Appeals oral argument, State v. Warsame, No. 86161-1-I (September 16, 2025) at 0 min., 50 sec. through 0 min., 57 sec., video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2025091171/?eventID=2025091171.

set forth in <u>Lundstrom</u>, we conclude the geographic boundaries condition is not unconstitutionally vague.

CONCLUSION

We affirm Warsame's convictions and the imposition of the challenged condition of community custody in his judgment and sentence.

_Chung, J._

WE CONCUR:

_Feldman, J._

_Hazelrigg_